IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM J. EINHORN<br>v.<br><br>APEX EQUIPMENT COMPANY, et al. | CIVIL ACTION<br><br>NO. 13-5500 |
| CENTRAL PENNSYLVANIA<br>TEAMSTERS PENSION FUND, et al.<br>v.<br><br>MURWIN PROPERTY MANAGEMENT,<br>LP, et al. | CIVIL ACTION<br><br>NO. 13-5501 |

**MEMORANDUM RE DEFENDANTS' MOTION TO DISMISS**

**Baylson, J.**                                                                                              **August 26, 2014**

This case arises under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 *et seq*. Plaintiff William Einhorn, acting as administrator of the Teamsters Pension Trust Fund of Philadelphia and Vicinity (the "Fund"), has sued Defendants.[1] In Count I of the Second Amended Complaint (the "Complaint"), Plaintiff seeks $2,775,803.89 in withdrawal liability from Apex Equipment Company ("Apex"). In Count II, Plaintiff seeks withdrawal liability from Allied Concrete & Supply Corp. ("Allied Concrete"), Construction Equipment Maintenance Company ("CEM"), DRE Corp., and Murwin Property Management, LP ("Murwin Property") (collectively, the "Murwin Companies")[2] because these five companies are allegedly trades and businesses under common control with Apex. Count III claims that the

---

[1] Defendants are Apex Equipment Company; Allied Concrete & Supply Corp.; Murwin Property Management, LP; DRE Corp.; Construction Equipment Maintenance Corp.; Allied Landscape and Contractor Supply Company; Murwin Construction Systems, Inc.; Allied Recycling Company; William Murwin Jr.; William Murwin III; James Murwin; Kellie L. Lavery; Joshua Gordon; Estate of Thad R. Murwin; and William C. Roeger Jr.

[2] There are additional companies owned by the Murwins that are named parties in this suit. Those companies are not relevant to this Motion.

1

named corporate defendants violated the MPPAA for failing to produce information required under 29 U.S.C. § 1399(a) regarding the collection of withdrawal liability.  In Count IV, Plaintiff has sued the Estate of Thad Murwin, among others, for engaging in transactions with the purpose of avoiding or evading withdrawal liability owed to the Fund.  Count V is a request for a remedy, not a claim for relief, to wit that any money transferred in transactions intended to evade or avoid withdrawal liability be placed in a constructive trust.

The Estate now moves the Court to dismiss Count IV of the Complaint in as much as it relates to the Estate for failure to state a claim upon which relief may be granted.

## I.   Statutory Background

In order to properly frame the facts alleged in the Complaint—which rely on concepts like "common control" and "withdrawal liability" that are unique to the MPPAA—a brief introduction to the statute is required.

The MPPAA amended the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.  As the Third Circuit succinctly described,

> The MPPAA was enacted out of a concern that ERISA did not adequately protect multiemployer pension plans from the adverse consequences that result when individual employers terminate their participation or withdraw.  The amendments to ERISA were designed to prevent employers from withdrawing from a multiemployer pension plan without paying their share of unfunded, vested benefit liability, thereby threatening the solvency of such plans.
>
> . . . .
>
> Congress recognized that multiemployer pension plans affected millions of Americans and found that withdrawals of contributing employers from a multiemployer pension plan frequently result in substantially increased funding obligations for employers who continue to contribute to the plan, its participants and beneficiaries, and labor-management relations. It intended for the MPPAA to uniformly impose withdrawal liability and to relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers.  To solve this problem, the MPPAA requires that a withdrawing

employer pay its share of the plan's unfunded liability. This insures that the financial burden will not be shifted to the remaining employers.

*SUPERVALU, Inc. v. Bd. of Trustees of Sw. Pennsylvania & W. Maryland Area Teamsters & Employers Pension Fund*, 500 F.3d 334, 336-37 (3d Cir. 2007) (internal quotation marks and citations omitted).

29 U.S.C. § 1381(a) provides that an employer that effects a "complete withdrawal" from a multiemployer pension plan is liable for its share of a plan's unfunded vested benefits. The MPPAA extends responsibility for payment of withdrawal liability beyond the withdrawing employer to "trades or businesses (whether or not incorporated) which are under common control" with the withdrawing employer. 29 U.S.C. § 1301(b)(1). A plan is entitled to collect withdrawal liability from any trade or business under common control with the withdrawing organization. Additionally, the MPPAA requires a court to negate any transaction if a principal purpose of that transaction is to evade or avoid withdrawal liability. 29 U.S.C. § 1392(c).

## II.  Facts[3]

### A.  The Murwin Companies

Apex was party to a series of collective bargaining agreements with Teamsters Local Union No. 384 under which Apex was obligated to make contributions to the Fund. The Fund is an "employee pension benefit plan" and a "multiemployer plan" within the meaning of ERISA and the MPPAA, respectively.[4]

Prior to September 1, 2009, Thad Murwin and William Murwin Jr. each owned 49.97% of Apex. William Murwin III owned the remaining 0.06%. These three individuals had identical

---

[3] These factual allegations are taken from the Second Amended Complaint. They are presumed true for the purpose of evaluating Defendant's Motion to Dismiss. *Phillips v. Cnty. Of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

[4] Although this is a legal conclusion, and thus not entitled to be presumed true for the purpose of this Motion, the Court will treat it as true because the parties do not contest that ERISA controls.

ownership interests in another company called Allied Concrete.  Additionally, Thad Murwin and

|  | Apex (Corp.) | Allied Concrete | Murwin Prop. | DRE | CEM |
|---|---|---|---|---|---|
| Thad Murwin | 49.97% | 49.97% | 49.5% | 50% | 50% |
| Wm. Murwin Jr. | 49.97% | 49.97% | 49.5% | 50% | 50% |
| Murwin III | .06% | .06% | - | - | - |
| DRE | - | - | 1% | - | - |

William Murwin Jr. each had a 50% ownership interest in CEM and DRE.  They also each had a

49.5% ownership interest in Murwin Property, with DRE holding the remaining 1%.  For

reference, the ownership interests in the Murwin Companies are summarized as follows:

**Ownership Interests in the Murwin Companies Prior to September 1, 2009**

### B.     Thad Murwin's Death

On September 1, 2009, Thad Murwin died.  The Estate assumed his interest in the

Murwin Companies.  The Bucks County Orphans Court approved Defendant William C.

Roeger's appointment as Executor of the Estate on September 25, 2009.

On February 19, 2010, Roeger, acting as administrator of the Estate, entered into an

agreement in which Allied Concrete, Apex, and CEM purchased the Estate's ownership interests

in these companies.  ECF 57 ¶ 81.  The Estate retained its ownership interest in DRE and

Murwin Property.  ECF 57 ¶ 82.  However, minutes of a Board of Directors meeting for DRE

held on December 31, 2009 indicate that DRE agreed to repurchase its shares from the Estate.

ECF 57 ¶ 65.  This transfer was not effected until after Apex withdrew from the Fund nearly two

years later.  ECF 57 ¶ 64.

According to the Complaint, after Thad Murwin's death, Apex, Allied Concrete, Murwin

Property, DRE, and CEM were under common control.  ECF 57 ¶ 81.  However, these

companies ceased being under common control after Roeger agreed to have Apex, Allied

Concrete, and CEM repurchase their respective shares from the Estate.  ECF 57 ¶ 81.

On November 1, 2011, Apex ceased contributing to the Fund and effected a complete withdrawal from it.  The ownership interests for the Murwin Companies on the date of Apex's complete withdrawal from the Fund are as follows:

**Ownership Interests in the Murwin Companies on November 1, 2011**

|  | Apex | Allied Concrete | Murwin Prop. | DRE | CEM |
|---|---|---|---|---|---|
| Wm. Murwin Jr. | 99.88% | 99.88% | 49.5% | 50% | 100% |
| Murwin III | .12% | .12% |  |  |  |
| DRE |  |  | 1% |  |  |
| Thad's Estate |  |  | 49.5% | 50% |  |

### C. Activity After Apex's Complete Withdrawal

According to the Complaint, the Estate retained its interest in DRE and Murwin Property until after Apex withdrew from the Fund on November 1, 2011 as part of a scheme to divest the Murwin Companies of their assets, breakup common control of the companies, and otherwise avoid the withdrawal liability owed to the Fund.

The Complaint alleges a handful of instances to describe this scheme.  On December 14, 2012, Murwin Jr. sold 15% of his 49.5% interest in Murwin Property to American Lease Management Co.  He then used the proceeds from that transaction to purchase the Estate's interest in Murwin Property and gifted that interest to his children, William Murwin III, James Murwin, and Kellie Lavery.  Murwin Jr. gave these gifts to his three children in an attempt to dilute ownership in Murwin Property and thereby render it no longer under common control with the other Murwin Companies.  ECF 57 at ¶¶ 85-86

On February 13, 2012, Allied Concrete sold 2.54 acres of land to Allied Recycling for $1.  The fair market value of the property was $321,261.60 at the time of sale.  The Complaint

5

alleges that a principal purpose of this transaction was to evade or avoid using the value of the land to pay the withdrawal liability owed by Apex. ECF 57 ¶¶ 78-79.

Finally, DRE's shareholder agreement required Roeger to notify DRE of Thad Murwin's death, at which point DRE had a 90-day period to elect to purchase Thad Murwin's shares. If the corporation declined, the other shareholder, Murwin Jr., would have a 15-day period to elect to purchase Thad Murwin's interest. ECF 57 ¶ 63. According to the minutes of a Board of Directors meeting on December 31, 2009, DRE elected to repurchase Thad Murwin's shares of DRE. ECF 57 ¶ 65. Although Thad Murwin died on September 1, 2009, and the Board meeting occurred on December 31, 2009, the Estate retained Thad Murwin's interest in DRE well into 2012—until after Apex withdrew from the Fund. ECF 57 ¶ 64. According to the Complaint, had Roeger complied with the DRE shareholder agreement, Murwin Jr. would have become the sole shareholder of DRE, which would have place DRE and Murwin Property under common control with the other Murwin Companies and thus subject to withdrawal liability. ECF 57 ¶ 83.

### D. The Suit

Plaintiff filed this suit on September 19, 2013. ECF 1. An Amended Complaint was filed on April 21, 2014. ECF 27. The Estate moved to dismiss the complaint on virtually identical grounds as its present motion. ECF 36. A hearing was held on June 25, 2014 to address the arguments raised in the Estate's motion to dismiss briefing. ECF 56. At the hearing, the Court permitted Plaintiff to amend its complaint once again to clarify and cure any deficiencies that had been brought to light at the hearing. Plaintiff filed a Second Amended Complaint on July 11, 2014. ECF 57. In it, Plaintiff seeks the following relief with regards to the Estate: (1) an order directing the Estate to render an accounting of all assets withdrawn from the Murwin Companies that should have been used to pay Apex's withdrawal liability and (2) liquidated

damages.[5]  ECF 57at 22.

The Estate then filed a Motion to Dismiss.  ECF 58.

### III. Legal Standard

#### A. Standard of Review

In its review of a motion to dismiss pursuant to Federal Rule of Civil Prodecure 12(b)(6), the Court must "accept all factual allegations as true and construe the complaint in the light most favorable to the plaintiff."  *Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008) (quoting *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 374 n.7 (3d Cir.2002)).  The factual allegations in the complaint must present a plausible basis for relief.  *Ashcroft v. Iqbal,* 556 U.S. 662, 680 (2009).  The Court will not assume as true legal conclusions couched as factual allegations or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 664.

#### B. MPPAA

##### (1) Common Control

As briefly outlined above, the MPPAA requires employers who effect a complete withdrawal from a multiemployer pension plan to pay their portion of unfunded, vested benefits of that plan.  A complete withdrawal occurs when an employer "(1) permanently ceases to have an obligation to contribute under the plan or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a).  "[T]he date of complete withdrawal is the date of the cessation of the obligation to contribute or the cessation of covered operations."  *Id.* § 1383(e).  "All covered operations" has been construed to mean "the substantial cessation of normal business activity."  *Crown v. Cork & Seal Co. v. Cent. States Se. & Sw. Areas Pension Fund*, 982 F.2d 857, 865-66 (3d Cir. 1992).  According to the Complaint, Apex effected a complete withdrawal

---

[5] The Complaint does not allege any facts indicating why Plaintiff is entitled to liquidated damages.

on November 1, 2011.

The MPPAA enables a fund to collect withdrawal liability from any trade or business under common control with the withdrawing organization. The Department of Treasury has issued regulations that define the term "trades or businesses under common control" to include a "brother-sister group of trades or businesses under common control." 26 C.F.R. § 1.414(c)–2(a). A brother-sister group under common control exists if

> (i) the same five or fewer persons who are individuals, estates, or trusts own . . . a controlling interest in each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization. The five or fewer persons whose ownership is considered for purposes of the controlling interest requirement for each organization must be the same persons whose ownership is considered for purposes of the effective control requirement.

*Id.* § 1.414(c)–2(c).

The definitions of "controlling interest" and "effective control" vary based on the type of organization at issue. Apex, Allied Concrete, DRE, and CEM are all corporations. Murwin Property is a limited partnership.

In the case of an organization which is a corporation, a "controlling interest" means "ownership of stock possessing at least 80 percent of total combined voting power of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation." *Id.* § 1.414(c)–2(b)(2)(i)(A). In the case of an organization which is a partnership, a "controlling interest" means "ownership of at least 80 percent of the profits interest or capital interest of such partnership." *Id.* § 1.414(c)–2(b)(2)(i)(C).

In the case of an organization which is a corporation, persons are in "effective control" if "such persons own stock possessing more than 50 percent of the total combined voting power of

8

all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stuck of such corporation." *Id.* § 1.414(c)–2(c)(2)(i). In the case of an organization which is a partnership, persons are in "effective control" if "such persons own an aggregate of more than 50 percent of the profits interest or capital interest of such partnership." *Id.* § 1.414(c)–2(c)(2)(iii).

### (2) Evading or Avoiding Withdrawal Liability

29 U.S.C. § 1392(c) provides that if "a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction." This provision prevents organizations subject to withdrawal liability from diverting or diluting their assets to avoid liability imposed by the MPPAA. "The instruction requires courts to put the parties in the same situation as if the offending transaction never occurred; that is, to erase the transaction." *Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 724 F.3d 129, 149 (1st Cir. 2013).

### IV. Positions of the Parties

The Estate's Motion rests on four arguments. First, the Estate is not a trade or business under common control with the Apex, the withdrawing company, and therefore it cannot be held liable for Apex's withdrawal liability. Second, because Thad Murwin did not incur personal liability when Apex effected a complete withdrawal, the Estate is likewise not personally liable for Apex's withdrawal liability. Third, the Murwin Companies were never under common control, and therefore no action by the Estate relating to the other Murwin Companies would have changed the fact that they did not owe any withdrawal liability incurred by Apex. Fourth, even if Plaintiff's theory is true, and the Estate attempted to engage in transactions intended to

evade withdrawal liability, the appropriate remedy is to disregard those transactions, not make the Estate itself liable. ECF 58 at 3-4.

Plaintiff argues, by reference to its Memorandum of Law in Opposition to the Motion to Dismiss the Amended Complaint, ECF 43, that regardless of the Estate's status as a trade or business it can still be held jointly and severally liable for Apex's withdrawal liability and all other remedies available under 29 U.S.C. § 1132(g). ECF 60 at 4. Plaintiff also argues, by reference to its Sur-Reply in Opposition to the Motion to Dismiss the Amended Complaint, ECF 51, that the Murwin Companies were under common control prior to Thad Murwin's death. ECF 60 at 4.

## V. Discussion

### A. Common Control and Evading Withdrawal Liability

The threshold issue in this case is whether and when the Murwin Companies were under common control. The Estate claims that the five Murwin Companies were never under common control, ECF 58-2 at 9; Plaintiff alleges that the five Murwin Companies were under common control until Roeger authorized the repurchase of shares by Apex, Allied Concrete, and CEM, but did nothing regarding the Estate's shares of DRE and Murwin Property, ECF 57 ¶ 81. The Complaint alleges that had Roeger completed this transfer with DRE all five Murwin Companies would have been under common control at the time of Apex's withdrawal. Put another way, when coupled with the delayed buyback of DRE's shares, the share repurchases with Apex, Allied Concrete, and CEM were transactions intended to avoid withdrawal liability because they resulted in the Murwin Companies no longer being under common control.

In order to assess whether these allegations state a claim, the Court must determine if the Complaint alleges that the Murwin Companies were under common control at the time of Thad

Murwin's death, but before the repurchase on February 19, 2010.

**Ownership Interests in the Murwin Companies After September 1, 2009 But Before February 19, 2010**

|                | Apex (Corp.) | Allied Concrete | Murwin Prop. | DRE | CEM |
|----------------|--------------|-----------------|--------------|------|------|
| Wm. Murwin Jr. | 49.97%       | 49.97%          | 49.5%        | 50%  | 50%  |
| Murwin III     | .06%         | .06%            | -            | -    | -    |
| DRE            | -            | -               | 1%           | -    | -    |
| Thad's Estate  | 49.97%       | 49.97%          | 49.5%        | 50%  | 50%  |

If five or fewer persons (or estates) own a controlling interest and exercise effective control of the Murwin Companies, then those companies are under common control. In order to own a controlling interest, five or fewer persons would have to own more than 80% of the shares or interest in each Murwin Company. Because the Estate and Murwin Jr. owned over 80% of each of the Murwin Companies between September 1, 2009 and February 19, 2010, together they exercised a controlling interest in the company. In order to exercise effective control, Murwin Jr.'s lowest interest common to all five companies when added with the Estate's lowest interest common to all five companies must be greater than 50%. Murwin Jr.'s lowest interest across all five companies is 49.5%, and the Estate's lowest interest across all five companies is 49.5%. The sum of these interests is greater than 50% and thus constitutes effective control. Thus, from September 1, 2009 to February 19, 2010 the Murwin Companies were trades or businesses under common control.

Next, the Court must determine whether the Complaint alleges that the Apex, Allied Concrete, and CEM stock repurchases, combined with the delayed execution of the DRE stock repurchase, caused the Murwin Companies to no longer be under common control at the time Apex effected a complete withdrawal from the Fund.

**Ownership Interests in the Murwin Companies After February 19, 2010 through November 1, 2011**

|  | Apex | Allied Concrete | Murwin Prop. | DRE | CEM |
|---|---|---|---|---|---|
| Wm. Murwin Jr. | 99.88% | 99.88% | 49.5% | 50% | 100% |
| Murwin III | .12% | .12% |  |  |  |
| DRE |  |  | 1% |  |  |
| Thad's Estate |  |  | 49.5% | 50% |  |

Because Murwin Jr. owned over 80% of Apex, Allied Concrete, and CEM, he had a controlling interest in them. Because his lowest interest common to all three was 99.88%, he also exercised effective control over them. Thus, Apex, Allied Concrete, and DEM were under common control when Apex withdrew from the Fund. However, Murwin Property and DRE were not under common control. Although Murwin Jr. and the Estate exercised a controlling interest in Murwin Property and DRE—a combined 99% and 100%, respectively—because the Estate no longer had an ownership interest in Apex, Allied Concrete, or CEM, its shares could not be considered when calculating effective control. This is so because when calculating effective control "ownership of each such person [shall be counted] only to the extent such ownership is identical with respect to each such organization," 26 C.F.R. § 1.414(c)–2(c). Accordingly, because the Estate did not have any ownership interest in Apex, Allied Concrete, and CEM, its ownership interest cannot be counted when calculating effective control for Murwin Property and DRE. Looking to Murwin Jr.'s interest alone, the lowest identical interest across all five companies is 49.5%, which is not greater than 50%.[6] Therefore, Murwin Property and DRE

---

[6] It is possible to argue that, because Murwin Jr. owned 50% of DRE and DRE owned 1% of Murwin Property, then DRE's share of Murwin Property should be attributed to Murwin Jr. If this were the case, Murwin Jr.'s share of DRE's interest in Murwin Property, to wit 0.5%, would be added to Murwin Jr.'s direct interest in Murwin Property for a total of a 50% ownership interest. This attribution is immaterial because the lowest common ownership interest across all five companies would still only be 50%, which is not *greater than* 50%, as required by the regulations defining effective control. *See* 26 C.F.R. § 1.414(c)–2(c)(2)

were not under common control with the other three Murwin Companies after the share repurchases and up through when Apex withdrew from the Fund.[7]

These computations, based on allegations made in the Complaint, demonstrate that but for the share repurchase transactions with Apex, Allied Concrete, and CEM—or, put another way, the delayed share repurchase with DRE—all five Murwin Companies would have been under common control at the time Apex withdrew from the Fund. The Complaint has also alleged that the Murwin Companies and their owners were aware of their exposure to withdrawal liability as early as September 26, 2007, when Murwin Jr. sent a letter to the Fund requesting an estimate of Apex's withdrawal liability. ECF 57 ¶¶ 43-44. Finally, the Complaint has alleged that DRE had 90-days to exercise its option to repurchase the Estate's shares of DRE, that DRE exercised that option within the 90-day period on December 31, 2009, but that the repurchase was not effected until after November 1, 2011, when Apex withdrew from the Fund. Taken together, and viewed in the light most favorable to Plaintiff, the Complaint has sufficiently alleged that these transactions were conducted with a principal purpose to evade or avoid withdrawal liability.

**B.     The Estate's Exposure to Withdrawal Liability**

Plaintiff next argues that the Estate is jointly and severally liable for Apex's withdrawal liability because it engaged in transactions to evade or avoid withdrawal liability through Roeger, its administrator. As an initial matter, the Complaint does not allege that the Estate is jointly and severally liable nor does it seek in its prayer for relief that the Estate pay the withdrawal liability. In its briefing, however, Plaintiff claims that by participating in a transaction to evade or avoid

---

[7] By the same token, had the DRE repurchase gone through before November 1, 2011 then DRE and Murwin Property would have resumed being under common control with the other Murwin Companies—that is, Murwin Jr. would have owned 100% of DRE. DRE's interest therefore would thus have been attributable to Murwin Jr.'s interest, which would have given Murwin Jr. effective control of Murwin Property, to wit 50.5%.

withdrawal liability the Estate becomes jointly and severally liable with Apex. This is not so.

The cases that Plaintiff cites stand for a different proposition entirely: the Fund can recover from parties that have received assets as a result of a liability-evading transaction, even if those parties were not organizations under common control with the withdrawing organization. *See IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993) ("Those assets must therefore be recoverable from the parties to whom they have been illegitimately transferred."); *Einhorn v. Twentieth Century Refuse Removal Co.*, Case No. 11-1451, 2011 WL 6779760, at *4 (D.N.J. Dec. 22, 2011) ("[E]very other court to have considered the issue has recognized that, to give meaning to § 1392(c), a fund must be able to pursue *the transferred assets* from the transferee as well as the employer/transferor." (emphasis added)); *Cent. States, Se. & Sw. Areas Pension Fund v. Denny*, 250 F. Supp. 2d 948, 953 (N.D. Ill. 2003) ("In such cases, a plaintiff can reach *those assets that were transferred* in order to evade or avoid liability, as well as the parties to whom they were improperly transferred." (internal quotation marks and alterations omitted) (emphasis added)); *Connors v. Marontha Coal Co., Inc.*, 670 F. Supp. 45, 47 (D.D.C. 1987) ("Count IV can properly only seek recovery of *assets actually transferred* to Moore and Fields personally, with the intent to evade or avoid withdrawal liability." (emphasis added)). Finally, Plaintiff's citation to *Unite Nat. Ret. Fund v. Rosal Sportswear, Inc.*, Case. No. 07–0773, 2009 WL 3241660 (E.D. Pa., Oct. 1, 2009) is also inapposite. That case involved a denial of summary judgment without reaching the question, answered in *Hermman*, whether the assets transferred to a third party were recoverable, because it was not clear as a matter of law that those transactions were done with a principal purpose to evade withdrawal liability. *Id.* at *7. Plaintiff has therefore cited no support suggesting joint and several liability, and the Court will not recognize such an extension of the law here.

The remedy for transactions with a principal purpose to evade or avoid withdrawal liability is to apply the MPPAA without regard to the offending transaction, or, in other words, to treat the offending transaction as if it did not occur.  29 U.S.C. § 1392(c).  Thus, the statute commands that the proper remedy is to ignore the stock repurchases on February 19, 2010 and treat the Murwin Companies as if they were under common control at the time of Apex's withdrawal from the Fund.

The decisions cited above have held that, in order to give full effect to this transaction-ignoring remedy, any improperly transferred assets must be collectible from the recipients of those assets.  Critically, the Complaint has not alleged any facts suggesting that the Estate has received assets resulting from transactions intended to evade or avoid withdrawal liability.  The Court is aware of the possibility that discovery may reveal that the Estate received assets as a result of transactions with the Murwin Companies to evade or avoid withdrawal liability.  In that scenario, Plaintiff would be entitled to collect the improperly transferred assets from the Estate.  If discovery yields evidence to that effect, the Court may permit Plaintiff to amend its Complaint to add the Estate as a party.  However, because the Complaint does not allege any facts that suggest the Estate received assets from the Murwin Companies as a result of any of the alleged transactions, the Complaint has failed to state a claim for relief against the Estate.

An appropriate order follows.

O:\CIVIL 13\13-5500 einhorn v. apex equipment\13cv5500.5501.082614.memo.mtd.docx